## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION
### LEXINGTON

| | |
|---|---|
| **In re: CAMBRIAN HOLDING COMPANY, INC.,** *et al.,* | |
| **Debtors,** | **CIVIL ACTION NO. 5:22-86-KKC** |
| **AMERICAN RESOURCES CORPORATION** | |
| **Appellant,** | |
| **v.** | **OPINION AND ORDER** |
| **KEY-WAY, LLC,** *et al.,* | |
| **Appellees.** | |

*** *** ***

This matter is before the Court on an appeal of the United States Bankruptcy Court for the Eastern District of Kentucky's order granting appellee Key-Way, LLC's motion to compel appellant American Resources Corporation (ARC) to pay certain post-petition trade payables. (Bankruptcy Case No. 19-51200-grs, DE 2009). For the following reasons, the Court will AFFIRM the decision of the bankruptcy court.

### I. Background

Most of the facts of the underlying bankruptcy matter and ARC and Key-Way's involvement are undisputed. What is important here is that Key-Way hauled coal for Perry County

Coal, one of the Debtors in the underlying Chapter 11 case.[1] Key-Way and Perry County Coal's relationship began in 2002, and those parties entered into a trucking agreement in 2011. The contract provided that Perry County Coal would pay certain rates per ton of coal refuse hauled from two branches. Key-Way contends that it also performed extra work for Perry County Coal—like cleaning out coal ponds, grading roadbeds, and more—throughout their nearly 20-year relationship. Though Key-Way began performing the extra work in 2003, it eventually contracted out the labor to Kentucky Mine Services (KMC), who used Key-Way's equipment to perform the work. Whether this extra work was actually contracted for and performed is the primary issue here.

Perry County Coal owed Key-Way north of one million dollars at the time it filed its bankruptcy petition. On August 6, 2019, Key-Way and the consolidated Debtors executed a Critical Vendor Agreement that acknowledged the pre-petition debt and established terms for post-petition services. The agreement obligated Key-Way to continue services for 90 days. Key-Way continued to perform services for Perry County Coal up and through the sale date.

On September 25, 2019, the bankruptcy court approved an Asset Purchase Agreement wherein Perry County Coal would sell its assets to ARC. This order made clear that ARC would assume all accrued and unpaid post-petition trade payables. On November 29, 2021, Key-Way filed a motion to compel ARC to pay for post-petition, pre-sale services rendered. (Bankruptcy Record, DE 1889). The order sought $48,010.71 for coal refuse hauling services and $59,891.40 for the extra work at issue here. The bankruptcy court granted Key-Way's motion and ordered ARC to pay for the coal hauling and the extra work—a total of $107,902.11—pursuant to the Asset Purchase Agreement. ARC does not dispute that it owes the sums for the coal hauling. The sole dispute on appeal is whether Key-Way is entitled to payment for the extra work.

---

[1] The case was jointly administered with the cases of Cambrian Holding Company, Inc. Perry County Coal filed its bankruptcy petition on June 16, 2019.

## II. Standard of Review

A federal district court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of the bankruptcy court pursuant to 28 U.S.C. § 158(a). In a bankruptcy case, the nature of the action taken below determines the applicable standard of review. *E. Coast Miner LLC v. Nixon Peabody LLP (In re Licking River Mining, LLC)*, 911 F.3d 806, 810 (6th Cir. 2018). "When an order of the bankruptcy court is appealed, the district court reviews the bankruptcy court's factual findings under the clearly erroneous standard, and its conclusions of law de novo. *Hazard Coal Corp. v. Cambrian Coal LLC*, No. CV 5:21-40-KKC, 2022 WL 4116910, at *6 (E.D. Ky. Sept. 9, 2022) (citing *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 656 (6th Cir. 2002)). A factual finding is considered clearly erroneous if, even though there is evidence to support that finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Asher v. Cook & Sons Mining, Inc.*, No. CV 20-137-DLB, 2021 WL 2695358, at *2 (E.D. Ky. June 30, 2021) (citing *United States v. Mack*, 159 F.3d 208, 215 (6th Cir. 1998)) (quotations removed).

There appears to be some dispute over the standard to be applied in this review. ARC claims that the two issues on appeal are both questions of law and thus should be reviewed de novo. Key-Way does not dispute this directly, but does devote time to asserting the proper standard as to questions of fact. For clarity, the Court will assess the proper standard of review for each issue on appeal.

ARC's first issue on appeal presents two distinct questions. The first involves the establishment of a contract and the second concerns whether the "extra work" was actually performed as per the contract. The existence of the contract is a question of law, and the question of whether the extra work occurred is a question of fact. If a question concerns both law and fact,

then it must be broken down into its constituent parts and the reviewing court must apply the appropriate standard of review for each part. *In re Batie*, 995 F.2d 85, 88 (6th Cir. 1993). Accordingly, the court will review the bankruptcy court's ruling on the contract de novo, and the finding of the work performance for clear error.

ARC's second issue on appeal is whether Key-Way's claims were administrative claims barred by the bankruptcy court's Bar Date Order. The bankruptcy court decided that the sums in question were post-petition trade payables. Accordingly, it is Key-Way's position that the administrative claims bar date has nothing to do with the claims here. This is an issue of law and the Court will review the bankruptcy court's decision de novo.

### III. Analysis

The questions regarding the existence and performance of the contract are moot if Key-Way indeed failed to submit a timely administrative claim, as ARC contends. Accordingly, the Court will first turn to ARC's second issue on appeal.

### A. The administrative claims bar date order was irrelevant here

A little over a month after the commencement of the bankruptcy case, the court entered a Bar Date Order that set a deadline of October 18, 2019 for the filing of administrative claims arising between the Petition Date (June 16, 2019) and the Claims Bar Date (September 30, 2019). (Bankruptcy Record, DE 259). ARC argues that, despite the bankruptcy court's Bar Date Order establishing the deadline, Key-Way never filed a timely administrative claim prior to filing its motion to compel. Key-Way does not suggest that it did in fact file a timely administrative claim. Instead, it argues that it did not need to—nor could it have even properly filed such a claim. Because the sums in question are unpaid post-petition trade payables which ARC contractually assumed, an administrative claim would have been the improper avenue for Key-Way's claims.

The bankruptcy court heard and dismissed ARC's argument in a March 8, 2022 evidentiary hearing. The court noted that the sums in question were trade payables "even if they're not the amount or you can't prove performance, these are the types of claims that would be trade payables covered under the American Resources purchase agreement." (DE 8-1, at 6). ARC agreed, saying that though it disputed the claim itself, "if proven these would be trade payables." (*Id.*). ARC then suggested Key-Way should have raised its claim before the administrative claims deadline, to which the court noted that the critical vendor agreement called Key-Way's claim a trade claim and that "it's not an administrative issue." (*Id.* at 7).

ARC mostly ignores this distinction between post-petition trade payables and administrative claims governed by the Bar Date Order. ARC provides caselaw for the proposition that bankruptcy courts generally deny untimely administrative claims unless the untimeliness was due to excusable neglect. But this correct assertion of the law is irrelevant here. ARC assumed responsibility for "all accrued and unpaid post-petition trade payables of any Seller relating to the Perry County Operations" pursuant to the Asset Purchase Agreement, which the bankruptcy court approved. (Bankruptcy Record, DE 534, at 185). As the bankruptcy court stated, "ARC conceded the obligations are assumed trade payables, to the extent proven." (Bankruptcy Record, DE 2009, at 1).

ARC provides no support for the assertion that claims for post-petition trade payables are administrative claims (which would relate to the administration of the Debtor's estate) and should thus be governed by the Bar Date Order. Nor does the caselaw support ARC's argument that because "Key-Way's claim is one that first has to be established as an accrued and unpaid post-petition trade payable of the Debtors, prior to ARC having any obligation to pay Key-Way pursuant to the APA, Key-Way would make that claim by filing an administrative claim . . . ." (DE 9, at 5-

6). None of the claims in the cases ARC cites were for post-petition trade payables assumed under an Asset Purchase Agreement. Accordingly, upon review, it is clear that the Bar Date Order did not bar Key-Way's claim.

### B. The agreement for the "extra work"

In granting Key-Way's motion to compel, the bankruptcy court found that there was "undisputed evidence in the form of direct testimony, the critical vendor agreement, and business records that . . . overwhelmingly shows Key-Way performed post-petition services at an agreed price for which it has not been paid." (DE 8-1, at 11). ARC disputes this. Its primary argument on appeal is that Key-Way both failed to establish the existence of a contract between Key-Way and Perry County Coal for the extra work and failed to establish that the extra work was actually performed. Specifically, ARC argues that Key-Way did not present enough evidence to establish the level of definiteness required of a contract. Upon a de novo review of the record, however, it is clear that the bankruptcy court correctly concluded that a contract existed. And the bankruptcy court's finding of performance is not clearly erroneous, as it is supported by the evidence.

Of course, if any type of contract existed here, there must be evidence of a separate agreement—apart from the Trucking Contract outlining the terms of the "normal work"—that shows the requisite elements of offer, acceptance, and consideration. ARC argues that for Key-Way to have a valid claim, "[t]here must be least some semblance of definiteness as to what services were to be rendered, when they were to begin and how long they were to last, and what was promised in recompense for the services." *Lore, LLC v. Moonbow Invs.*, LLC, No. 2012-CA-001305-MR, 2014 WL 507382, at *7 (Ky. Ct. App. Feb. 7, 2014). This is true even when the contract is based upon acts in the ordinary course of dealing. *See Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 439 (6th Cir. 2014) (citing *Kovacs v. Freeman*, 957 S.W.2d

251, 254 (Ky. 1997)). Here, there is sufficient evidence establishing both the existence of an ongoing agreement and that the extra work was performed pursuant to that agreement. *See id.* at 440 (citing *Rider v. Combs*, 256 S.W.2d 749, 749 (Ky.1953) ("Kentucky law [recognizes the existence of a contract] when the record shows acts or circumstances which according to the ordinary course of dealing show a mutual intent to contract.") (cleaned up).

Key-Way produced business records and the testimony of its sole owner Wayne Lackey to support the existence of an agreement and the habitual performance of the extra work. Lackey stated that "throughout the course of [Key-Way and Perry County Coal]'s contractual relationship, Perry County Coal would request Key-Way to perform additional services unrelated to coal refuse hauling. These additional services included clean-up work, excavation services, dozer services, pond cleaning, and other miscellaneous services . . . ." (Bankruptcy Record, DE 1960, at 3-4).

Lackey testified that he contracted with KMS to do the extra work and "dealt with them on a daily basis." His primary contact regarding the extra work was KMS representative Tim Parker. (DE 8-1, at 25-26). And though Lackey said that he, personally, did not directly supervise the extra work, "Perry County Coal monitored it daily" and "never disputed any invoice [Lackey] ever turned in." (*Id.* at 27). Further, the time sheets Key-Way sent to Perry County Coal were faxed weekly, and Lackey testified that he never once received "any pushback" from Perry County Coal regarding the work documented on the sheets. (*Id.* at 48). Key-Way produced documents supporting Lackey's testimony, including an account of the extra work payment and non-payments (Bankruptcy Record, DE 1960-4) and timesheets from the relevant time periods noting the equipment used, the hours worked, and the hourly rate. (*Id.* at DE 1960-6). These timesheets contain the date and time they were faxed to Perry County Coal, as Lackey testified was the weekly practice.

ARC argues that Lackey's testimony is unpersuasive at best, and that perhaps Tim Parker would have made a better witness for Key-Way. But Lackey is the sole owner of Key-Way and the custodian of records. He was able to testify that the records submitted for the extra work were taken at or near the time of the work, because he was in contact with someone on the ground at least every other day. (*Id.* at 46-48). The bankruptcy court correctly found ARC's argument unpersuasive, considering Lackey had personal knowledge of the timeliness and ordinary practice of the records as their custodian. Lackey's familiarity with the records and practice of his business is more than enough to satisfy FRE 803(6).

Further, ARC presented no evidence to contradict Lackey nor the records to which he testified. (*See* DE 8-1, at 5). ARC's main attack on Lackey is that he did not oversee every aspect of the extra work and is therefore unable to testify, with any credibility or definiteness, as to an agreement. But his delegation is not evidence of a lack of credibility. And ARC's main attack on the corroborating records is that Key-Way did not produce signed timesheets or invoices. But this is simply not how the parties did business, according to Lackey. Moreover, this lack-of-particular-evidence argument is not persuasive, in light of the positive evidence Key-Way submitted supporting its claim. Perry County Coal consistently paid for these services for years. This ordinary course, supported by Lackey's testimony and the documents provided, clearly shows that the parties had an agreement for this extra work and that there is a balance outstanding.

## IV.

For the reasons set forth above, it is hereby ORDERED that  the bankruptcy court's order granting Key-Way's motion to compel is AFFIRMED.

This 27th day of March, 2023.



KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY